Next, we'll call Appeal Number 06-1135, In Re Pet Food Centers LLC. Mr. Persenny, good afternoon. Welcome to our current court location. Please proceed. Good afternoon. May it please the court, I am Tim Persenny of Blank Rome from Philadelphia, and I appear before the court today on behalf of Pet Food Centers LLC. This appeal stems from the final determination of the Trademark Trial and Appeal Board, sustaining a final refusal under Section 2E1 of the Lanham Act to register pet foods trademarked. Do you agree that the decision of the board rests entirely on a fact finding? I believe so. And do you agree then that our standard of review that we're required to follow is rather deferential, usually under the label substantial evidence? No, I believe it's actually less deferential and more generous review, because essentially the court reviews the board's legal determination de novo as factual findings for substantial evidence. And in this instance, because it's a determination of the spectrum of where the mark falls, whether it's fanciful, suggestive, descriptive, or so forth. Well, I thought we had case law that squarely holds that mere descriptiveness is a question of fact. Whether something is merely descriptive is a question of fact, right or wrong. I believe that N. Ray Oppendahl is the standard that you're referring to, Your Honor. That would be an illustrative holding. Yes. Do you agree with me or we're disagreeing? I believe we agree. Okay. Now, doesn't that force us into the highly deferential mold that if the trademark examiner's evidentiary basis amounts to something that crosses the mark between insubstantial and substantial that we're required to affirm? Well, I believe, frankly, that the facts and the evidence of record will not hold up to that standard. We'll get to that in a second. I'm trying to get agreement, if we can, on what the standard is, and I think you're agreeing with me that if the evidence was more than insubstantial, we have to affirm. Well, that the evidence adequately supports the ward's or the office's determination, I believe, is what the law supports. Well, the statute and the cases use the term substantial, as Judge Michel has suggested, not adequate. Okay. If there is a difference. Yes, there is. So we should all stay with substantial, do you suppose? I'll go with substantial because- Then you've got to help us, if we're going to understand your case, because you've got to pinpoint for us, what is it about the various Internet printouts that the trademark examiner relied on that makes them too flimsy, too weak, too thin, too small, too shallow, or something to support this conclusion? Certainly. Well, of the record that's before the court, there are approximately about seven or eight different references from the Internet that the office contends supports the allegation that the mark is descriptive for the mark used in connection with pet treats. I'd represent to the court that if you- The question, factually, is whether a pet treat is a plaything? Is that what we're talking about? You could say it that way. I mean, essentially, the office position is that because of- So you want to use the label plaything, is that correct? Playthings. Playthings. Correct. For a variety of pet treats. Of edible pet treats is the description of goods. And the office says pet treats are played with, and so calling pet treats playthings is simply a description. Correct. That's the TTAB's finding. And I think the chief judge is asking you, how can you say there's no substantial evidence in the record to support that? Well, if you were, for instance, to put pet treats into Google, you'd hit 11,800,000 hits. If you put it in Yahoo, you'd get- Well, wait a minute. If you're saying you could have put in a lot of evidence on your side, I wouldn't doubt that for a second. My recollection of the record here is that the trademark examiner put in her evidence, and you made a lot of legal argument but didn't put any rebuttal evidence or countering evidence of any sort. Am I misremembering? Well, no. The absence of that evidence, I mean, there's a reason why the office didn't put any more evidence in. I'm asking about whether you put any evidence in. Well, we did put in evidence, but not of that sort. We didn't put in references that didn't show pet treats being played with. Hard to prove the negative. And it is, Your Honor. But if you look specifically at the actual references that are part of the appendix in the record- Yeah, that's my question. What's wrong with the references on which the trademark examiner principally relies? Because they, frankly, Your Honor, don't show the word playthings used in a descriptive way. I mean, if you look through, for instance- To what extent can we look at the way the mark is used in the context of your trade dress? I'm not sure if I follow Your Honor's question. Playthings is presented in your presentation. It has a cartoon dog throwing a treat to a cartoon cat. And they are obviously playing with this treat that is being tossed back and forth. To what extent can we see that as indicative of describing the nature of the product? Well, I take one small issue with your description. What it is is it's a dog and a cat- It's in the record. It shows what it shows. But it's a ball. It's not a treat. They're throwing a ball. And what it is- Okay, so there's some kind of playing going on, and it says playthings, and that's okay. Absolutely. But what that is is- But it's not playing with one of your treats, is that your point? Absolutely not. That is, of course- Unless your treat is ball-shaped. Well, yet, it is not. It is, it's a ball. And the reason why it shows pets playing is it's to reinforce the commercial impression of the mark. This is not unusual. I mean, many times, consumers or makers- But it's not part of the mark. Right. The design? Yes. No, it is not. Just the word. This is a word mark, pure and simple. It is a block letter, registration, two separate words, playthings. And that's the entirety of the mark you applied to register. Yes, Your Honor, that's correct. So anyhow, the specimen is really just reinforcing the commercial impression of the mark. It's showing playthings. The specimen- What's the answer to Judge Rader's question of the extent to which we can understand or interpret or assess the mark in light of the little cartoon? I don't know that the court can. I mean, the specimen- Are you saying we're precluded from giving any weight to the cartoon? In Kenner v. Rozart, we did specifically note that the trade dress, in limited circumstances, not always, because we have instances where we have abided by the classic rule that trade dress is not relevant to trademark presentation. But in that instance, we said, ah, but trade dress can be enlightening. It can help us understand the context of your mark. Why wouldn't we do that in this case? Well, I'm not suggesting you necessarily couldn't. But let me explain, first of all, what the- We could, but we shouldn't? Well, let me explain what the specimens are, because I'm not sure that it's clear to the court what they are. The specimens- The specimens? What do you mean by specimens? There are two specimens that are of record. There is an oblong little- For dogs. It's the dogs playing catch. What that is is a piece of cardboard that's stapled over a clear plastic bag that contains the contents of the package. Is this an intent-to-use application? It was originally filed, Your Honor, as an intent-to-use, but a statement of use was subsequently filed. And then you later used it, and you used it in the context of this trade dress that we've seen. What is of record is the specimen is a cardboard piece that folds over the top, and it hangs on wall hangers, and so it's got a picture. But the product itself is clear, and the consumer is able to see through it. Getting, I guess, back to your question, really- Your question is whether we can see through it. Well, and I'm hoping Your Honors will, because, frankly, playthings, there's just really no evidence that shows that- I mean, if you look specifically at the stuff that the office has put in here- To what extent is the Internet, which is the bulk of the evidence that the TTAB uses here, to what extent is the Internet reflective of consumer perception? I don't know that it is, frankly, Your Honor. Well, doesn't it depend on what it is you pull down off the Internet? Well, I think that's probably possible, too. Well, didn't the examiner here rely on things like advertising or catalogs or other salesmanship sort of papers by purveyors of these sorts of products? Well, the examining attorney clearly did in this instance, and I guess my point- What's wrong with that? Well, why isn't that reasonably accurately reflective of the understanding of consumers when they see words on a package? It may be, but my point was that there are essentially five or six articles that were put in here out of 11,800,000, which there is presumption that if there was more that the office would have put more in. But if you look even at the particular items that are in the record, for instance, the Happy Trails- Well, what is your point, that there's some sort of required ratio that if the examiner can't amass more than 20 percent of the total literature existing on the Internet, that somehow it's legally deficient? Well, I'm not suggesting that, but I'm suggesting if there's only a couple out of millions, the odds are that the millions don't support the position. Maybe all the rest are neutral, don't support nor refute. You see, it would make a big difference if it refutes it, but then it's your burden to put it in. So the fact you didn't put anything in from the other 11 million makes me think they didn't help you. Well, that may well be, but the point is if you look at what is in the record, if you look at, for instance, the Happy Trails Pet Mart website, of the 22 products listed there, 17 or 18 of them have no reference whatsoever to pet treats and play. There's none whatsoever. And if you look at the three or four that the office relies upon, if you look at them carefully, you'll see that they don't support the office's proposition. Do we have a somewhat greater requirement to defer here in view of the fact that trademark examiners, number one, are attorneys, and number two, are expert to some extent or degree in consumer protection in the context of word and pictorial marks? Well, Your Honor, as a former examining attorney, I was never privy to such a wonderful burden. No, I'm asking a philosophical question. If it were an ordinary layperson, you could make an argument that that person is no better a judge than he is or I am or he is or anybody in this room is. But we don't have an ordinary person. We have somebody, as you remember, as you yourself were, trained as an attorney and who does trademark work all day every day for some extensive period, therefore some considerable level of expertise. And then we have that attorney's final reconsideration decision in this case, second decision, reviewed by a multi-adjudicator board of other people who are also attorneys and also experts and also do this all day every day for some period of years. That two-level infusion of expertise might suggest that we should be at the height of substantial evidence deference because of that expertise. What say you? Well, you know, if I guess back in my old days of being an examining attorney, that would have been a lovely burden to have or the law behind it. But, frankly, I don't believe that's what the law is. I'm not aware of any cases or statutory authority that puts such a proposition. Do you think we're precluded from considering the apparent level of expertise of the examiner and the board? When you say that's not what the law is, I might remind you we make the law. So the question really is, does that position make sense? Does what Judge Michelle is pointing out, should that influence the way in which we read the record? No, I think that would be very dangerous, frankly. Dangerous to your client or dangerous to the law's development? Dangerous to what? Well, I believe it would certainly be dangerous to the consumer interests here. I mean, the whole body and premise of trademark law is to protect consumers from confusion and then to protect the people who have put in the capital and developed these marks to be able to protect their marks. And so I think it goes on both sides. But getting back to the actual evidence, I mean, if you look at the three things that are in here, goofballs, the dingo goofballs, are listed under treats. But if you look at them, they're actually toys that have a treat inside them. The treat is to entice the dog to play with the toy. Dogs, everyone knows, when you give a treat to an animal, it eats it immediately.  They play with toys. And the few instances that the government has here are all toys that use a treat as bait. Does your argument depend on our agreeing with the typology that something is either an edible treat or it's a toy? Well, I mean, for instance, this particular application is for edible treats, and so that's the only real issue before the court. I get that you're not a dog owner. I have owned dogs, Your Honor. Are we going to testify now? Just answering the question. But getting back to these items. That was very fast thinking on your feet. If you look, you know, the goofballs, that particular one, which the government puts a lot of its case on, and the examining attorney as well, goofballs actually happens to be registered. It's 2928341 for pet toys. And it's in Class 28, which is for non-edible things. And there's a reason why the office did that. And I guess in this instance, I'd like to rely on the office's good judgment of having classified it in the proper class. Those goofballs? Yes, Your Honor. Time is about to expire. Do you want to save any for rebuttal? I did, I believe, save five minutes for rebuttal. Well, you also used it, but we'll restore two minutes. Thank you, Your Honor. I appreciate it.  Good afternoon. Nice to have you back. Thank you, Your Honor. Mr. Jenks, since he represents the Patent Office on a fairly regular basis, along with his many colleagues, they also have expertise, but we don't defer to them. Please proceed. Thank you, Your Honor. May it please the Court. I'd like to start right with the standard of review that the Court questioned my opponent about. We've spent a lot of time on that. To be merely descriptive, it has to immediately convey the impression of the characteristics in this case. This is not talking about a product. This is talking about an activity. Play is an activity, not a product. How does that immediately convey the characteristic of the product now? This is registered for treats, not for activities. Well, Your Honor. Make that jump. And remember, if we have to use our imagination in some fanciful way to make that jump, it's suggestive and you lose. That's correct, Your Honor. And these treats are, as Judge Michel was talking about earlier, not part of an either-or situation. We really have, from food to toys, a continuum of objects, many of which are edible and most of which your pet will play with. For example... My English foxhound eats whatever I throw at him. He doesn't mess around with it. Well... I'm testifying. I noticed. It's appreciated, Your Honor. That's one member of the public and important one. You made it. But I would say that as these treats are marketed to the public, and that's what the evidence shows, as they're marketed to the public, the fun aspect, the play aspect, is emphasized in various examples that the examining attorney pulled and put into evidence. For example... Pulled from the web. Many of which were pulled from the web. That's correct, Your Honor. Shouldn't a reasonable court ignore the web? Not when it's dealing with the public, Your Honor. I ask that in a semi-facetious way, but there's a serious question under that, and that is, where do we look for evidence of meaning for a claim like this, or for a phrase like playthings? There was an article in today's paper about blogs, and what is it? There's 500,000 blogs, some enormous number a day being added, and all the stuff that's going on. Is that a database on which we can derive anything meaningful? Well, if you're looking at the entire database, you have a lot of input coming from a lot of sources. So in a case like the one before the court, the question is, what can be shown from those sources? If there's a single source that is isolated and says something that is perhaps not really construable fairly against the applicant, then you have one type of case. Here, everything we've seen pulled, and it's from multiple sources on the internet, shows that these items, these treats, are often marketed for their fun and their playful ability. Mr. Ficini was quite adamant in pointing out that the examples you used were all toys associated with food. This is just flat-out edible food. There's not a toy involved. This is a food product. Well, Your Honor, the first thing I'd say to refute that is, look at the specimen that was filed by the applicant in his intent-to-use amendment, or excuse me, in his actual-use amendment. The specimen is on page 829. It's also in the red brief, the office's brief on page 6. There, the goods listed in the package are chews, toys, and other fun stuff. So the only edible thing on that list of products is the chews. And the record indicates that chews are marketed for, particularly dogs, to play with. There are many references to the fun for your pet and the hours of chewing fun. Give me that in the record again. If we look at 829, I'm seeing the picture. Oh, I see. It's the underlying trade address, chews, toys, and other things. That's right. So on the applicant's goods. What is the product that this appears on, an edible treat? The only toy in this. Nobody's saying the record says there's a toy inside this. The only thing in the record about the content of the package is 829. And the listing underneath playthings. What is playthings registered for? It's registered for pet treats, Your Honor. And chews have been found to be in the treats arena and fall within the definition of treats. So treats is a broad term. Essentially, for a dog, would include anything edible. And then there's training treats. There's on one end of the spectrum where the dog is simply fed the treat after performing an act. Then there are fun-shaped treats for dogs and cats, which have a playful aspect to them. And then there's chews and rawhide toys and bones that are all edible, that are included in an applicant's specimen, and that are marketed as being played with. And finally, at the very extreme, is the dingo goofball, which was discussed earlier on pages A-157 through 58. We just like the name. As do I, which is why I bring it up. But I will point out that at the top of A-58, the dingo is entirely edible. Dingo is a delicious combination. The things you're pointing out to us again are the trade dress. They're not the mark. The mark is play things registered for an edible pet treat. And so you still have to tell us how play things is describing a characteristic of something you eat or the animal eats. And you said it exactly right, Your Honor. It's something the animal eats. In the human world, perhaps we have food and toys at two opposite ends. But in the animal world, the animal plays with its mouth just like... Where does the record substantiate that? Well, the question you presented wasn't in the record. However, the record does show that the dog toys are edible. So when they talk about the world's tastiest dog toy, it's something that's eaten, it's a treat, but it's also something that you play with. Mr. Jenks, is there some kind of buried notion in discriminating different ranges of your broad continuum from one extreme to the other of how long the pet fools with the object before ingesting it? Judge Rader said his dog would instantly eat the treat. And we see in the record that some of these artificial bones, chews, I guess they're categorized as take quite a while, at least for most animals. So is there some kind of notion here that we can use a stopwatch or a clock to distinguish between things which are just treats, not toys, and where the line crosses over to something that's both edible and a toy? Well, Your Honor, the record doesn't give you a stopwatch of that nature, but it does imply that many of the things, particularly the chews, which are applicants' goods, that's the only thing in the record shown about his goods, are good for hours. Hours is in the record in several places of chewing fun. And as we go across the continuum, ultimately you get to the non-toxic toy, which is not food and not a treat. Well, how about two minutes? Two minutes a treat, or is two minutes a play toy? Well, I would say two minutes is a treat, one quality of which is the playfulness the animal feels. How about one minute? How do we measure playfulness? How do we know how much fun the cat is having for the two minutes? I think we can look at our dictionary definitions of playthings, which show that if the animal is amused, something that serves to amuse is a plaything. So if it's gobbled up, it's not amused. Anytime I'm amused, I'm amused. Everything I eat is a plaything. Well, I would say that when you eat a lovely dinner, it's mostly food and perhaps you're preoccupied. When you have a candy whistle, then that's a bit more amusing. So we, even in the human world, can inch along the spectrum. Mr. Jenks, what's the harm in letting them have this plaything label? That's a terrific question, Your Honor. The harm is we're removing from the lexicon words we can use to describe products. So consumers who are out there making these choices, they're at Petco, they're on the web, they're making these choices. If they see something described as a plaything or as a toy, they know that's a treat that's fun to play with. And if we remove what can be described, then the consumers don't get that information. In other words, by approving this plaything for their particular product, you're saying we would deny it to all other products on the market that might be of interest to consumers relative to things their pets might have. That's exactly right. And I would add that this rejection for merely descriptiveness does not preclude the applicant from ever getting a trademark on playthings. If the applicant can establish that, over time, that mark has acquired distinctiveness for their products. In other words, it has become a source indicator for their products. And it's had three years to build up that record. And none of that information is in the record or the evidence presented to the patent attorney's office. But it could be the basis of a future application for the very same mark based on acquired distinctiveness. That's exactly right, Your Honor. Under 1052F, you can acquire distinctiveness through substantially using the mark in the marketplace without overlap. And I believe a prima facie case can be made with five years of substantially exclusive use or other showings. For example, it's often been used abroad or large advertising budget with no competitor doing the same. So if he were smart, he'd get busy on the blogs. Is that right? I suspect that he is smart and that they are working towards that, which the office will be happy to look at the evidence when it becomes available. Mr. Jenkins, do you think there's any difference that something was actually pulled off the Internet by the examiner as opposed to if the examiner went to, I'm going to imagine now, a library that has every sales catalog ever published in the world and pulls off paper copies of catalog ads for pet treats? I think the world is going towards the first one so that eventually there will be no paper catalogs. And it's a great question because it's something we're going to have to deal with. But does it matter? Does it matter from the standpoint of the law whether it comes electronically off the Internet if it also, at least historically, has appeared in sales catalogs or advertisements in store windows and box labels and so on? No, Your Honor. I think with either scenario, the evidence usually is accepted on its face. In other words, the catalog is usually considered a legitimate offer for sale and the Internet websites that actually market goods and services are generally considered a good evidence of a legitimate offer for sale. So both of them have at least a prima facie legitimacy and undermining either is possible, though the kind of evidence we have in this case I think would be impossible given the variety of websites and different sources the examining attorney looked to and used. Okay, now I've promised to restore some rebuttal time to Mr. Passini even though he used up all his time. You have not yet used up all your time. But if you've covered all your points, maybe you can stop. Your Honor, I'm happy to yield the remainder of my time. Thank you, sir. Mr. Passini, good spiritedness of opposing counsel will be able to stay on the larger schedule which has to do with the subsequent use of this handsome auditorium. So we'd appreciate it if you would match Mr. Jenks' generosity by seeing if you can do your two-minute rebuttal in one minute. I'll do everything I possibly can, Your Honor. First, I'd like to point out that applicants' goods are not chews. They're edible pet treats. And chews typically are rawhide, which are international class 18. This is an international class 31 product. The specimens, there's been some contention as to what they're used in with. The specimens are used in a whole line of things. This particular specimen was put in to support use in connection with pet treats. The fact that the specimen doesn't say pet treats is irrelevant and it's certainly no legal requirement that the specimen say specifically what the goods or services are. So I just point that out. Again, I'd like to go back to the legal standard here. It has to be significant. It has to be immediate for these products. I would contend to the court that playing with a treat is neither significant nor immediate. And additionally, I'd like to point out that the doubt is supposed to be decided in the favor of the applicant here, which in my view obviously didn't happen. And finally, I guess to conclude, unless the court has any other questions, we'd submit that based on what we've said here today and the briefing, that the trademark trial appeal board's finding that play things is merely descriptive as applied to pet treats, constitutes reversible error, and is unsupported by substantial evidence. Thank you, sir. We thank both counsel. And by the way, I apologize for mispronouncing your name at the outset. I think I got it straight eventually. It's an important thing to do. We appreciate your patience. Thank both counsel. The case is taken under advisement.